[No. 29153. *En Banc.* April 24, 1944.]

RAYMOND W. CLIFFORD *et al., Respondents,* v. THE STATE OF WASHINGTON, *Appellant.*[1]

[1]Reported in 148 P. (2d) 302.

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■ ■■■■

*The Attorney General* and *Harold A. Pebbles, Assistant,* for appellant.

*MacBride & Williams,* for respondents.

MILLARD, J.—This action was instituted to recover damages in the amount of twenty-five thousand dollars, alleged to have been sustained by plaintiffs as a result of the unlawful encroachment and casting of material upon their real property by defendant in its excavation for, and construction of, a building upon the state capitol grounds at Olympia. Defendant admitted encroachment upon plaintiffs' real property, but denied damage to the property in any amount as a result of that invasion. The cause was tried to the court, which found that defendant in the prosecution of the construction of a new building, known as the transportation building in the state capitol group, acting pursuant to law, made arrangements for excavating for the foundation of said building and for the dumping of the excavated material upon a slope then existing within the capitol grounds and located in close proximity to the common boundary of plaintiffs' property and defendant's property (plaintiffs' northerly boundary and defendant's southerly boundary). Acting through its engineering representatives and through a contractor engaged for that purpose, defendant began and continued the excavation and dumping and created a large fill of clay, earth, and gravel extending south of its building site toward the common boundary with plaintiffs.

"Said excavation and dumping so carried on by the State of Washington through said Committee at the location aforesaid, has caused slips or slides of material to occur, and as the same occurred defendant has caused additional material to be deposited to replace that which has slipped or washed away, the result of which has been to produce large movements of earth, rock and debris and surface growth upon the aforesaid slope, down the aforesaid slope, and across the aforesaid common boundary. Said slips and slides are of a continuing nature and occurred at various times since said fill was put in, one slide having occurred a few weeks prior to the date of trial. As an immediate and direct result of said slips and slides of material, large masses of earth, rock and debris and surface growth have been deposited upon plaintiffs' property, by reason of which the valuable lawn, gardens, ornamental trees and shrubs then existing upon the plaintiffs' property have been buried and destroyed. As a further and immediate direct result of said slips and slides and deposits of material upon plaintiffs' property, the lower part of plaintiffs' property has been used by the State as the toe of said slope and is burdened with earth, rock, debris and surface growth deposited thereon. As a further and immediate result of said slips and slides and deposits of material, water from Defendant's property drains onto Plaintiffs' property and the natural drainage of Plaintiffs' property as it formerly existed has been changed so that drainage of water from Plaintiffs' property has been impeded, resulting in the forming of a boggy area on the lower part of Plaintiffs' property. That as a direct result of the aforesaid acts of the State of Washington and the encroachment upon and use of Plaintiffs' property as the toe for said slope and by reason of said slides and by change of drainage as aforesaid, the fair and reasonable market value of the Plaintiffs' property has been reduced and depreciated in the sum of Ten Thousand ($10,000) Dollars, and Plaintiffs have been damaged in said amount."

Judgment consonant with the foregoing findings was entered in favor of plaintiffs. Defendant appealed.

Counsel for the state assign as error the refusal of the court to consider appellant's evidence on the question of damages. It is argued that, while the court listened to the testimony of the witnesses, observed their demeanor on the stand, and personally viewed the premises, it is ob-

vious from a reading of a portion of the court's memorandum opinion that the court refused to consider the appellant's evidence on the question of damages to respondents' real property. The court's memorandum opinion reads as follows:

"It is patent that the witnesses for the State in this case proceeded upon a fundamentally wrong idea. They conceded encroachment by the State, but insisted that because the property was more valuable than the usual residence in Olympia and that because the grounds were larger than is usual for the average residence, that the market value had not been decreased because a buyer would not desire the additional acreage.

"The court viewed the property and the fact of encroachment and damage is very apparent. Because of the view just expressed, the only testimony left in the record is the testimony of plaintiff's witnesses, who are men of experience and ability in their line.

"In accordance with their testimony and the Court's belief, judgment may be taken for the plaintiff in the sum of ten thousand dollars ($10,000)."

Counsel for the state concede that ordinarily the memorandum opinion of the trial court constitutes no part of the record on appeal, but insist, citing as sustaining authority *English v. Hetherington & Berner,* 71 F. (2d) 613, that, where, as in the case at bar, the trial court in its written opinion passes on the admissibility of evidence, which was the effect of the court's refusal to consider appellant's evidence on the question of damages, the trial court's opinion to that extent becomes a part of the trial record and should be considered on appeal. To further buttress their position, counsel for appellant cite subd. 5, Supreme Court Rule IX, 193 Wash. 11-a, which provides that, where the trial court has filed a written memorandum giving its reasons for its decision, the same shall be included as a part of the statement of facts. In *Quigley v. Barash,* 135 Wash. 338, 237 Pac. 732, in answer to the contention of appellant that the trial court, at the conclusion of the testimony, gave an oral decision contrary to its written findings, we held that the court's oral

decision was not a finding of fact and that the final ruling was "within the breast of the court" until it entered its formal findings. See, also, *Colvin v. Clark*, 96 Wash. 282, 165 Pac. 101; *In re Patterson*, 98 Wash. 334, 167 Pac. 924; *Swanson v. Hood*, 99 Wash. 506, 170 Pac. 135.

In *Johnson v. Pheasant Pickling Co.*, 174 Wash. 236, 24 P. (2d) 628, we held that, under Rule of Court III, subd. 4, 159 Wash. xxxiv—the old number of the rule cited by appellant in the case at bar—which provides that a memorandum decision of the trial court if brought to this court on appeal shall be made a part of the statement of facts, such decision will be stricken if included in the transcript and not made a part of the statement of facts.

As the memorandum opinion was not made in pursuance of statute or court rule nor was it incorporated in and made a part of the court's formal findings, it is no part of the findings of fact and judgment entered pursuant thereto, and cannot be used to impeach the findings or judgment. The trial court's memorandum opinion was merely an informal expression of the court's views and forms no part of the findings or judgment.

"While it is said to be proper for the trial court in rendering a decision to embody its reasons in either a written or oral opinion, such an opinion does not constitute either findings of fact or conclusions of law. This being so, it is not commendable practice for a court in its formal findings to refer to and incorporate a portion of a written opinion on file." Bancroft's Code Practice and Remedies, Vol. 2, § 1682, p. 2161.

"It is said to be commendable practice for a trial court to furnish counsel or file with the records a statement announcing the reasons for its decision. Such a statement, however, is in no way binding; its only function is to indicate the judge's opinion as to the points involved and his views as to the law applicable. The statement of reasons constitutes no part of the decision of the court, is insufficient as a finding of fact, and should not be incorporated into the conclusions of law; it may indeed be modified or nullified by the making of findings of fact and conclusions of law, or by the entry of a judgment, inconsistent therewith, and it may not be employed to impeach the findings."

Bancroft's Code Practice and Remedies, Vol. 2, § 1615, p. 2081-2082.

While a memorandum opinion of the trial court may be brought to this court on appeal, if made a part of the statement of facts, such memorandum opinion is not made in pursuance of statute nor required by any rule of court; hence, it cannot be used to impeach the court's findings or judgment.

We are clear from our reading of the memorandum decision that the trial court did not, in effect, strike the evidence of appellant's expert witnesses, but found that that evidence was outweighed by the testimony of respondents' expert witnesses on value.

■ The findings of the trial court on conflicting evidence will not be disturbed unless the evidence clearly preponderates against the findings. The evidence is as follows:

In 1931, respondents purchased the property in question. It consists of three parcels or lots upon which is a thoroughly modern brick residence containing ten rooms, four bathrooms, and a lavatory. The residence is upon a lot which we will designate as tract A, which has a frontage of 103 feet on Sylvester street and is 124 feet long. Tract A is respondents' lot B, which abuts lot A to the west. It is 264 feet along the north on appellant's boundary by 115 feet east and west. The lot designated as C extends westerly from lot B a distance of 375 feet for the north boundary and approximately 287 feet for the easterly boundary, which is waterfront. The lower part of respondents' property sloped gently toward the water and the whole property overlooks Puget Sound with a view of the Black Hills in the distance. The landscaping and gardens in the fall of 1938 were substantially the same as when respondents purchased the property in 1931. That portion of the property surrounding the house was in lawns and gardens with water system throughout. That portion of the property from the main lawn sloping down toward the sound and northerly toward the land of appellant retained a portion

of its natural growth but had been improved with ornamental trees, lawn, and a formal garden; in fact, the property was known as one of the show places of Olympia.

Adjoining the property of respondents to the north and running from Sylvester street to the water is property owned by appellant which was purchased from a Mr. Haig and is referred to as the Haig property. This property lies between respondents' property and the new transportation building, which appellant commenced to construct in November, 1938. This building closely adjoins the Haig property, which with the other property of the state upon which the transportation building was built, drops off rapidly toward Puget Sound, the foundation of the transportation building being only a few feet from the edge. On the Haig property immediately north of the common boundary line between it and respondents' property was a gully running from an easterly apex westerly in the sound becoming deeper and wider as it descended. Respondents' property was so situated that the natural drainage from it flowed onto the Haig property.

All of the surface dirt and excavation for the basement of the transportation building were dumped as a fill on the Haig property. This work was done during the rainy winter season of November, December, and January. This dirt filled the gully and moved over from a northeasterly to a southwesterly direction onto respondents' property. Some of the dirt was deposited into the sound, but a large amount was deposited upon the lawns and gardens of respondents' property. The first slide covered most of the flower beds and gardens on tract C. Subsequent slides occurred farther up the slope on tract B, and that dirt slid down into the gardens.

In addition to flooding the gardens with mud, the fill reversed the natural flow of drainage from respondents' property, as a result of which the portion which was lawn on tract C became practically a swamp. As part of the dirt washed into Puget Sound, a delta was formed in front of respondents' property, so that, instead of having a clear beach as before, the delta caused a collection of refuse

on respondents' waterfront. As late as 1943, there was a slide which deposited a considerable amount of gravel onto respondents' property.

■ The evidence is in conflict as to the amount of dirt and other material deposited by the slides upon respondents' property. It is clear that there has been an actual encroachment upon respondents' property by a number of slides from the large unstable fill placed upon appellant state's property, and that there had been a continuous washing out and filling in with new material, and that the fill, which is approximately 118 feet in height, had not come to rest, although the work on it began more than five years prior to the commencement of the trial. An engineer for appellant state testified that in his opinion the fill had become stabilized, but we note that, in a letter written by him December 29, 1941, to an assistant attorney general, he entertains the view that there is a possibility of further sliding. There is evidence that the first slide covered the formal gardens and lawn on the lower part of respondents' property and that thereafter it was not possible to maintain such gardens and lawns.

As a result of appellant's creation of the delta in front of respondents' property, respondents now have a beach upon which debris collects when formerly they had a clear beach which was free from debris.

Another element of damage was reversal of the drainage, as a result of which where respondents formerly had lawns and gardens the place is now a swampy bog. This constitutes a taking, for which respondents are entitled to recover, of their property within the provision of Art. I, § 16, of the state constitution.

■ Respondents consulted a contractor and a landscape gardener in the hope that their property might be placed in a condition similar to its condition prior to the depositing of the material by appellant upon their property. It was ascertained that to restore the property it would be necessary to construct a concrete retaining wall, install new water pipe, and fill in the property with approximately five thousand cubic yards of dirt over an area

of 28,575 square feet at a cost of $12,500. In addition, it would be necessary to put in top soil for a lawn at an estimated cost of $1,100.

Respondent husband testified that in his opinion the value of respondents' property prior to appellant's encroachment upon it was $34,500, and that the value of the property at the time of the trial, as a result of the encroachment, was $21,500, or that respondents had been damaged in the amount of $13,000. Three experienced realtors and appraisers, who were familiar with values in the district and with the respondents' property in general, testified, after taking into consideration that the property was improved with gardens and lawns, that the market value of the property prior to the invasion by appellant was thirty-five thousand dollars and that the depreciation in value resulting from the state's encroachment upon the property was ten thousand dollars.

One witness testified on behalf of appellant that respondents' property had not depreciated in value as a result of the encroachment, and that in his opinion the fact that respondents' property was waterfront did not make it of any additional value. It is manifest why the court gave little weight to the testimony of this witness, as that witness did not take into consideration, as the record discloses, the improvements upon the property or that it had ever been improved or that the overgrowth upon the property was subsequent to the slides.

The testimony of two men who had been in the real estate business twelve years in Olympia is similar to that of the witness just mentioned. One did go so far as to testify that respondents were entitled to recover one thousand dollars, stating there was a nuisance value not to exceed that amount. Those two witnesses apparently were of the view that, if the encroachments did not partially benefit the property, no damage resulted therefrom; and they did not take into consideration that the setting of a house like respondents' required land of an area in excess of that of the ordinary city lot; and that the invasion of those two tracts immediately adjoining the lot upon which

the residence was located depreciated the value of the entire property, and, in the assessment of damage, the property must be considered as a whole.

The trial court correctly found that the evidence adduced by respondents outweighed that on behalf of appellant on the question of damages sustained by respondents. The trial court correctly refused to adopt the basis upon which appellant's expert witnesses premised their opinions as to the amount of damages sustained by respondents.

The judgment is affirmed.

SIMPSON, C. J., BEALS, STEINERT, BLAKE, and GRADY, JJ., concur.

ROBINSON, J. (dissenting)—The state, relying upon the trial court's declaration in its memorandum decision that "the only testimony [as to value] left in the record is the testimony of plaintiff's witnesses," assigns as error that the court, in effect, struck the testimony of its value witnesses. The majority point out that, under our decisions, and those of the courts generally, the memorandum decision cannot be used to show that the evidence of its witnesses as to value was disregarded. This ruling is unquestionably correct. But the majority immediately go on to say:

"We are clear from our reading of the memorandum decision that the trial court did not, in effect, strike the evidence of appellant's expert witnesses, but found that that evidence was outweighed by the testimony of respondents' expert witnesses on value."

It would seem that, having denied the benefit of the memorandum decision to one of the parties to the appeal, the majority would not, in the next breath, employ it for the benefit of the other. But whether the respondents, as the majority hold, may take the benefit of the memorandum decision, while the state cannot, is of little practical importance; for, even if the words of the memorandum, "the only testimony [as to value] left in the record is the testimony of plaintiff's witnesses," had never been written, filed, and made a part of the record, we would still know that the judgment was entered on that theory. It

reflects the testimony of the respondents' witnesses only.

Three witnesses testified for the respondents as to values. For convenience and brevity, I will call them A, B, and C. They were in perfect accord. Each of them testified that, before the encroachments, the Clifford property could have been sold for $35,000, and after, for $25,000.

Three witnesses testified for the state as to values. X testified that, after the encroachments, the property was worth $21,125; Y testified that, after the encroachments, it was worth $18,000; and Z testified that, after the encroachments, it was worth $15,000; and each of them testified that, in his opinion, it could not have been sold for very much more before.

The court entered judgment for $10,000, strictly in accordance with the uniform testimony of the respondents' witnesses; for $35,000 less $25,000 is, obviously, $10,000. Obviously, the evidence given by the state's witnesses was wholly disregarded. Yet, there is nothing in the record to show that their qualifications were in any way questioned. There has been some slight intimation, in argument, that they may have exhibited prejudice, but there is no foundation for that in the record. If they were attempting, by their testimony, to aid the state, they acted in a very peculiar manner. The respondents' witnesses testified long before the state's witnesses were called. Each of them said the property was worth $25,000 in its damaged condition. Had the state's witnesses been bent upon keeping the damages down, they would have increased, or at least accepted, that figure; but they respectively testified that, in its damaged condition, the property was worth but $21,125, $18,000, and $15,000. To my mind, the fact that they did not agree to the penny as to the value of so extensive a property, but differed rather widely among themselves, does not discredit their testimony. On the other hand, it induces me to believe that each individually expressed his true opinion.

The striking difference between these two sets of witnesses is as to the value of the property before it was damaged. X said that, before it was damaged, it was worth

but a little more than $21,125; Y, a little more than $18,000; and Z, a little more than $15,000. A, B, and C all said $35,000. This is an astounding difference. The average of the valuation of the property before damage, as given by the respondents' witnesses, is, of course, $35,000. The average of the valuation, as given by the state's witnesses, is a little more than $18,045, not a great deal more than half that given by the respondents' witnesses. Starting with the fact that the qualifications of all six witnesses were similar, and that all six are entitled to the presumption of honesty and fairness, how can such a discrepancy be accounted for? It was this problem that bothered me at the first hearing of the case, and continued to do so until I had carefully examined the record. Happily, the answer I find therein casts no reflection on the good faith of any of the six witnesses, or, for that matter, upon anyone else; but, before going into that, I think it desirable to state more of the background of the case.

The trial judge evidently wholly disregarded the evidence given by the state's witnesses, because he thought they were wrong in believing that, because the property was so large, its market value had not been materially affected by the relatively small area of the encroachments. But that has no bearing upon the value of the property before it was damaged, and I perceive no valid reason why he completely disregarded the evidence of the state's witnesses as to that and accepted $35,000 as the only evidence on the point, in view of the fact that the highest figure given by the state's witnesses was $21,125, and the average of their valuation was but little more than $18,000. The $35,000, of course, is the most important figure in the case. The uniform testimony of the respondents' witnesses being accepted and the evidence of the state's witnesses being disregarded, a judgment of $10,000 followed as a matter of course. It also follows that, if that $35,000 was excessive in any amount, then the judgment is excessive by the same amount.

After examining the testimony and exhibits in the case, I have been further convinced that the physical facts do not

sustain a judgment for $10,000. As is pointed out by the majority, the property involved is a strip of land running from Sylvester street, in Olympia, westward to the meander line of the inlet which extends southerly to Tumwater. It is immediately south of the capitol grounds, as extended by comparatively recent acquisitions. I gather from the maps and exhibits that one, standing on the top of the easterly edge of the fill behind the transportation building, would have a complete panoramic view of all of the low-lying property upon which the encroachments actually occurred, as well as of the rear and southerly elevations of the respondents' house, standing at street level high above it.

The majority, in describing the property, divides it into three tracts, A, B, and C. For reasons which will later appear, I divide it into A, B, C-1, and C-2. Tract A, as the majority points out, is composed of three lots facing Sylvester street, constituting a rectangular plot having a frontage of 103 feet on the street and a depth of 124 feet, or an area of 12,772 square feet. This is high, street-level property, with a fine and unobstructible view; for, at and very near the west boundary of the tract upon which the house stands, there is a deep and almost precipitous drop-off to the low-lying tracts B and C. On tract A is a large house, of which the detailed plans are in the record. Its completeness is indicated by the fact that, in addition to the ordinary rooms, it has a game room, a solarium, maid's room with bath, and upstairs sitting room and sleeping porch. In describing it, Mr. Clifford said that it ". . . overlooks Puget Sound and in the distance overlooks the Black Hills." Continuing, he said:

"The house on the property is a solid brick structure, portions of it reinforced by steel. It is of the highest of construction throughout. It rests upon a very substantial concrete, reinforced concrete foundation. It has a slate roof, and it has some ten rooms, four bathrooms and a lavatory. . . ."

There can be no doubt but that this house, even if it had no more ground appurtenant to it than the ample

tract on which it stands, would, on account of its completeness, sound construction, and unobstructible view, be justly regarded as one of Olympia's finest homes. It must be remembered throughout, however, that the appellant did not take any part of, or encroach upon, tract A in any manner whatsoever. In fact, it is not until we run down westerly 155 feet along the north line of tract B that we come upon the first encroachment. It is most unfortunate that the expert witnesses for the state, as to values, were not asked what the value of tract A, with its splendid improvements, would have been had the state irretrievably taken all of tracts B, C-1, and C-2, instead of merely damaging relatively small portions of those extensive low-lying tracts.

Tract B, 115 feet in width, and, therefore, twelve feet wider than A, extends from the west line of tract A, produced a few feet on each end, toward the inlet, a distance of 264 feet. Having found no taking with respect to A, we now proceed to inquire what portion of B was taken.

There is a conflict in the evidence as to the area of the encroachments. It appears from the record that the material which came down the slope was of a soupy and free-flowing nature, dropping its solid material as it crossed the boundary and then spreading out to a mere film. In making its estimates, the state apparently regarded only the area that was covered to some substantial thickness. The respondents, in marking off the encroachments on the plat, as will be later shown, must have included in the area the last thin traces. This, I concede, they had the right to do. I mention the matter at this point primarily as explanatory of the wide discrepancies in the evidence. The respondents have marked the encroachments upon a scale map, using red hatching to indicate their respective areas. As they are entitled at this point in the case to have the evidence viewed in the light most favorable to them, I use their own maps and plats (Plaintiffs' Exhibits 9 and 12) and their own testimony in making the following computations:

Going down the north line of tract B from the west boundary of tract A, the encroachment shown by the respondents on tract B begins at 155 feet and is wedge-shaped, beginning at the eastward end at nothing and gradually widening out to about 25 feet from the north boundary. About 25 feet from the west boundary of tract B, this line swells out in a somewhat semicircular way and arrives at the west boundary about 45 feet from the north boundary. Giving the respondents the benefit·of every doubt in computing so irregular an area, it is clear that the encroachment cannot possibly exceed 2,000 square feet. This is the only encroachment on tract B, and, as its area is 115 by 264 feet, that is, 30,360 square feet, it appears that the state has encroached upon 6.5 plus per cent of the respondents' tract B and left untouched 93.4 plus per cent thereof. It further appears that this encroachment, the only one on tract B, is in its remote northwest corner, and the bulk of it is at least 250 feet from the house.

Tract C, no part of which is within 264 feet of the tract upon which the house stands, is partly low-lying upland and partly the fore-shore between the high tide line of the inlet and the government meander line. It is much more than twice the width of the other tracts, being 287 feet wide throughout. Its north boundary is the north boundary of tract B, extended westerly, but its south boundary is 172 feet farther south than the south boundary of B extended. In other words, at a point 264 feet from the west boundary of the house tract, the property swells out to a width of 287 feet. This tract is 370 feet in length along the north boundary, and it appears, from respondents' Exhibit 9, that it is perhaps 40 or 50 feet less on the south boundary, due to the irregularity of the meander line.

From a consideration of respondents' Exhibits 9 and 12, it is clear that at least 170 feet of this tract (which I will designate as tract C-1) is upland, and, multiplying 287 by 170 feet, we find the area to be 48,790 square feet. The irregular encroachment marked by the respondents squares up, making generous allowances for possible error,

to an area 160 x 45, or 7,200 square feet, which is 14.7 plus per cent of the whole. Therefore, there remains to the respondents 85.2 plus per cent of tract C-1.

As to tract C-2, the muddy fore-shore covered at high tide, the encroachment was much greater in extent. How much greater we cannot determine from the evidence. But the issue here is as to whether or not the encroachment was a positive benefit. There is convincing evidence that it is. Now, instead of a muddy, mucky fore-shore, the respondents have a hard sand and gravel beach. They complain, however, that the beach has been extended out into the water, and that, on that account, it catches disfiguring driftwood as the tide ebbs and flows.

An engineering witness testified that but 69.7 cubic yards of material flowed out upon the upland. He submitted a plat, drawn to scale, showing all the particulars of the encroachments (Exhibit 17). An engineer testified for respondents with particular reference to what it would cost to remove the encroachments. He was, therefore, fully qualified and equipped to refute, and, no doubt, would have refuted, the testimony that the whole volume of the encroachments was but 69.7 cubic yards, had that testimony been susceptible of refutation. But neither he nor anyone else disputed it, and we must, therefore, accept it as a proven fact.

The respondents' evidence is to the effect that the encroachments on the upland cover 9,200 square feet; 69.7 cubic yards of material would cover 9,200 square feet to an average depth of a little less than two and one-half inches. However, it is testified, on behalf of both parties, that the encroachments were from a foot to a foot and a half in depth where they cross the boundary, and, at some points on the boundary, deep enough to have destroyed ornamental trees. Since, as marked on the scale map by Mr. Clifford, they cross 275 lineal feet of boundary, about one-seventh of the whole volume of the encroachments must, therefore, lie on the first one foot strip of the respondents' property, and, consequently, at their outer edges, they must be thin indeed.

The theory upon which the state's witnesses as to value proceeded was expressed by one of them, as follows:

"The area involved in the encroachment is so small that it wouldn't make much difference to a buyer. I don't believe it would make any difference. Q. As I understand your testimony, it is not to exceed $1,000. A. That is right."

Persons may well differ as to that amount, and, also as to the reasoning upon which it is based, but, in my opinion, the reasoning, in the light of the facts, is tenable, and, certainly, not so unfounded that it can rightfully be held to warrant a complete disregard of the testimony of these witnesses. One of the respondents' value witnesses explained their theory in this way:

"The setting of a house of that caliber, in my estimation, is ruined. A house of that caliber must have a setting and it had a setting. The same would apply to your lot. If I was to take half or a third of your lot away, I wouldn't place the same value on it. That house must have a certain sized lot or certain setting. I figure the same thing on Mr. Clifford's house. To me, the thing is gone. . . ."

Throughout the case, it has been argued and contended that the property is ruined, because it is said that the beautiful gardens extending down nearly to the shore line are destroyed. But assuming that they were hopelessly damaged—which, however, is not the case—there is ample room left for their reproduction.

Accepting the respondents' own testimony as to the location and area of the encroachments, it is clear that all of ample tract A, with its house and other improvements, is absolutely untouched; in fact, there is no encroachment within about the length of a city block of the house; 93.5 per cent of tract B, the next tract to the westward, is free from encroachment; and more than 85 per cent of tract C-1 which extends to the high water mark of the inlet. Let us suppose that, instead of merely damaging small portions of those tracts (6.5 per cent of B, 14.7 per cent of C-1), the state had taken and fenced off all thereof north of the furthest penetrations of the encroachments on each. Tract B would still lie back of the house, with a

continuous width of 70 feet, stretching in a straight line directly away toward the inlet, and tract C-1 would still continue stretching directly westerly to the shore thereof, with a continuous width of 242 feet. The main garden, of the alleged destruction of which the greatest complaint is made, is on this tract, and, though said to be 200 feet in length, was but eighteen feet in width. There is room left in this tract, south of the encroachments, for thirteen gardens of that width and even greater length, although only the northerly three or four would be within direct lines drawn from the house tract to the shore of the inlet.

There are, however, some other elements of damage. There was a water line running down from the house. Two or three of its 25 or 30 faucets were covered, several ornamental trees were partially covered or damaged, respondents say, six or eight; the state's witnesses confine it to two or three, and say that some of these were native trees. There is also a claim (quite well rebutted) that drainage has been interfered with, but the major complaint is of damage to the gardens.

A series of photographs, taken about 1929, are in the record, showing the beautiful gardens which the former owner, Mr. Titus, maintained, principally on tract C-1. We accept the evidence of both respondents that they gave these gardens considerable personal attention, and that a gardener was employed a portion of the time. Mrs. Clifford testified, however, that, after the first slide in 1938, no work was done on the gardens other than pruning a few apple trees in the southwest corner of tract C-1. However, the evidence is overwhelming that the gardens were neglected long prior to that.

The main garden was near the northeast corner of tract C-1. This, Mr. Clifford testified, was a large rectangular rose and perennial garden which, Mr. Clifford testified, was, perhaps, 150 to 200 feet in length and about 18 feet wide. From the north side of this bed, there was a lawn extending to the north boundary line. Mr. Wohleb, the architect who had charge of the construction of the transportation building and the fill, went down this boundary

line in November, 1938, just before construction commenced. As to the condition of this garden and strip of lawn at that time, his testimony was, in part, as follows:

"There was evidence that there had been considerable development in there. There was evidence that a lawn had been maintained there at one time and there was also some dozen or more rose bushes, I didn't count them definitely, but I did observe that, but the appearance at that time, appeared that it had not been maintained for some little time, because the grass and growth was quite high and the rest of the area showed no evidence of recent maintenance."

Mr. Murray, a civil engineer, surveyed and ran the boundary line a short time before November 20, 1938, when the job was started. When asked as to the condition along the boundary line, he testified, in part, as follows:

"A. It was practically all covered with brush and briers, excepting a small space on the lower part of the flat at the bottom. Q. I hand you what has been marked Exhibits, Plaintiffs' Exhibits 3 to 8, inclusive, and I will ask you if those pictures represent the condition of the Clifford property as you observed them when you where down there in 1938? A. Some of these pictures show the upper part, the upper level, they are probably reasonably correct. The rest of them—there was no formal garden on the lower part of the property. It was practically all—if there ever had been any there, they had grown wild from neglect."

There was testimony by other witnesses to the same effect. I shall quote only from that of Mr. Albert E. Hart, superintendent of the capitol grounds and a gardener of forty years' experience. He made an examination of the damaged property in October, 1941, and testified, in part, as follows:

"Q. What was the condition of what was known as the garden, the lawn property and flowers and shrubbery that were in there apparently at one time? A. Well, the lawn—it was lawn possibly at one time, but it had been let go for a period of years, possibly 6 or 7 years. Q. Six or seven years is the time you would say. Handing you what has been marked Plaintiffs' Exhibits 3 to 8 inclusive, I will ask you if in October of 1941 you observed any condition such as that shown by the pictures? A. I wouldn't recog-

nize the place from the pictures. Q. How long would you say it would take to get the property into the condition, the way you saw it, to that condition? A. I would say six or seven years, according to the growth of grass, of grass mounds that have grown. Q. Mr. Hart, when you made your examination in 1941 did you observe anything with reference to the base of the trees along the boundary line? A. Just about one had a considerable deposit around it. It would be a native yew."

The state objected to the introduction of the photographs taken in 1929, and assigns their admission as error. The assignment must be rejected, as they were clearly admissible to show what could be done, and, indeed, what had been done, on the land in question, and it will be assumed that the court admitted them for that purpose only. But the state is clearly right in its contention that the $10,000 award is based upon the condition of the property as of 1929, that is, as shown in the photographs, not its condition nine years later in 1938 when the damage was inflicted.

The photographs were produced very early in the case, and discussed and commented on by Mr. Clifford. After he had completed his testimony, respondents' witnesses as to value were immediately called. Witness A said that he saw the property fifteen or sixteen years before, and, about six weeks before the trial, went all over it. He testified that it could have been sold for $35,000 before the slide, and $25,000 thereafter. On cross-examination, he testified as follows:

"Q. So that you hadn't seen the garden portion of the property from, we will say roughly 1930, prior to that time, until 1941? A. That is correct."

Subsequently, he said: "Not until 1942."

After testifying that the property was a "show place" when he came to Olympia sixteen years before, witness B testified:

"Q. You have been in the garden? A. *I haven't been in the gardens, except in the past — the first time I was down to the garden was about a year and a half ago.* Q. After the slides had started? A. Yes. Q. And your familiarity

with the property, then, was more or less of a general nature? A. Yes." (Italics mine.)

He also said the fair market value of the property prior to the slide was $35,000, and $25,000 afterwards.

Witness C testified, in part, as follows:

"Q. How long have you known that property? A. *Well, I only saw the property once and that was in 1928 or 1929 and I did not see the property since then, until yesterday.* Q. Have you generally been familiar with the property during that period of time? A. Well, no only in a general way. Q. Been in the house? A. I was in the house and on the grounds in '28 or '29. Not since, until yesterday. Q. In '28 or '29, you saw the garden? A. Yes, very beautiful and show place of Olympia at that time." (Italics mine.)

Whereupon he was asked the value of the property as it was prior to the slide. He answered, as the two others had done, $35,000, and, as the others had done, that its sale value was $25,000 thereafter. On cross-examination, he testified, in part, as follows:

"Q. You say you haven't seen this property between the years of 1928 and 1943? A. That is, I haven't inspected the property. I have been by it. Q. You haven't been on it? A. I have not. . . . Q. *Your indication of the fair market value, $35,000.00, was fixed in your mind as of what time? A. When I saw it. Q. The property as you saw it in 1929? A. That is right."* (Italics mine.)

(This was the same witness who based his conclusions upon the fact that the setting of the house was "gone." As, in so testifying, he undoubtedly envisioned its setting in 1929, he was at least measurably right about that.)

The state at once moved to strike the evidence of C, and, clearly, the motion should have been granted, at least in part. No damage was inflicted on the property by the state until December, 1938. Of what materiality was the value of the property nine years before? The pertinent inquiry was, what sum would the property have sold for in the market during the fall of 1938? But, as is conclusively shown by that portion of C's answer, last above quoted, in fixing the $35,000 figure, he did so upon the assumption

that the property was in the same state of development in 1938 that it had been in 1929.

It is further clear that witnesses A and B, who, to a penny, arrived at the same result, made the same assumption. It cannot be otherwise, for they knew nothing about the state of the gardens in 1938. No portion of the large garden about which the controversy principally raged is nearer Sylvester street than upwards of 430 feet, and, as shown by their testimony, hereinbefore quoted, witness A had not been down there since 1930, except in 1942, while witness B had never been down there until a year and a half before the trial, which would mean about September, 1941, almost three years after the slides began. This defect in the chain of evidence was clearly brought out in the colloquy between court and counsel following the state's motion to strike the testimony of witness C. The following occurred:

"MR. MACBRIDE: In order to obviate any ruling in the matter I will ask this question. Q. *Assuming, Mr. Bridenstine, that the property was substantially the same in 1938, prior to the slide, as when you had inspected it last, then, what would your testimony be in regard to these values?* MR. PEBBLES: I object to that. It presupposes something that is not in evidence. THE COURT: *I think I am safe in assuming that it will be in evidence, counsel will no doubt tie it up.* THE WITNESS: A. I think I would place approximately the same value on it in '38 that I would have put on it in '29." (Italics mine.)

No damage was inflicted by appellant on the respondents' property until November or December, 1938. Both parties to the case faced difficulties in adducing proper proof of damage. Apparently, the respondents set out to prove their damages by showing (1) that the sale value in 1929 was $35,000; (2) that the property was in substantially the same condition nine years later in 1938 when the damage was inflicted; (3) that the real estate market was in as good condition in 1938 as it was in 1929; and (4) that, after the slides, the property would not sell for more than $25,000. There is evidence to support propositions (1), (3), and (4), but evidence to sustain (2), an abso-

lutely necessary link in the chain of proof, is missing. That alleged fact was merely assumed. As we are now dealing with the very crux of the matter, I request the reader to drop back a few lines and re-read the quotation which immediately precedes this paragraph.

The tie-up was never made. It is true that, near the end of the case, Mrs. Clifford testified that the gardens were, in 1938, in substantially the same condition as when they purchased the property, but a reading of the context shows that her attention was directed to the layout of the gardens rather than to their state of cultivation. If it were a fact that the gardens were in as good condition in 1938 as they were when Mr. Titus owned them in 1929, that is, as shown in the photographs introduced in evidence (Exhibits 3-8), they were still one of the showplaces in Olympia in 1938 and a matter of almost public knowledge. Undoubtedly, if they still retained their surpassing loveliness, that fact must have been known to every friend and neighbor of the respondents, and proof of it could have been made by many disinterested witnesses. In an evident attempt to comply with the court's assumption that he would tie the matter up, respondents' counsel did draw upon that logical repository of evidence. He called, as the last and final witness in the case, Mr. Ernest Mallory. After Mr. Mallory had testified that he was a close neighbor of the respondents and had been in the gardens since they were owned by the respondents "at least once a year, and sometimes three or four times a year," he testified that the garden, in 1929 when Mr. Titus owned it, "was a very beautiful place," and "you might say, had its wedding dress on," and he stated, in response to the decisive question put by respondents' counsel:

" . . . *As I recall it, along in 1936 or '37, in there, it was probably, oh, sixty-five or seventy per cent as nice as it was when Titus had it at its peak.* Q. That is the way it struck you? A. That is my opinion." (Italics mine.)

This evidence does not supply the missing link in the chain of proof, to wit, that the property was in substantially the same condition in 1938 that it was in 1929. On

the contrary, it shows, in and of itself, that it was not, and, moreover, it strongly tends to corroborate the evidence as to the actual condition of the gardens in 1938 previously given by state's witnesses, Wohleb, Murray, Duffy, and Hart. For, although their evidence indicates a greater degree of deterioration, such deterioration is progressive, and it must be remembered that Mr. Mallory was testifying as to conditions in "1936 or '37," while Wohleb, Murray, and Duffy were describing conditions existing in November, 1938, at least a year, and, possibly, two years, later.

It will also be noted that Mr. Hart testified that the conditions in 1941 were such as to indicate that the gardens had been neglected for six or seven years. This also tends to support Mr. Mallory's testimony that they had materially deteriorated (from thirty to thirty-five per cent) as early as 1936 or 1937.

Clearly, the judgment of ten thousand dollars includes damages for which the state is in no way liable, damages not only for deterioration which occurred before 1938, but damages for deterioration that occurred after 1938 and before the date of trial. For, it is admitted by respondents that they abandoned all care of the gardens after 1938, and it clearly appears that tangles of blackberry bushes, and trees fifteen feet high, had already grown up in the garden at the time the state's witnesses visited it to appraise the sale value of the property. But this latter deterioration is of secondary importance. The major mistake was made as to the value of the property at the time the damage was inflicted. The $35,000, upon which the amount of the judgment directly depends, is, for the purposes of this case, a wholly fictitious figure, innocently arrived at, but fictitious nevertheless, because it is the value as of 1929, a full nine years before the damage for which recovery is sought was inflicted. The missing link in the chain of proof adopted by the respondents is evidence that the property was in substantially the same condition when it was damaged in 1938 that it was in 1929, nine years earlier. This missing evidence was never supplied, and, in

view of the record, it is manifest that the judgment is grounded upon assumption, not on evidence. The trial judge fully realized the defect in the proof during the course of the trial. I requote:

"MR. PEBBLES: I object to that. It presupposes something that is not in evidence. THE COURT: I think I am safe in assuming that it will be in evidence, counsel will no doubt tie it up."

Since the majority affirm the trial court, it at first blush seems strange that the familiar formula—the trial court saw and heard the witnesses, and was, therefore, in a better position to judge the matter than we are, etc.—is not invoked in the last paragraph of their opinion, and particularly so, since, in this case, the trial judge not only saw and heard the evidence, but actually visited and inspected the property during the trial. We, like other courts, have, in practice, applied that formula with great elasticity, but it clearly could not be stretched to meet the necessities of the majority on the present occasion. The point here is that there is a missing link in the chain of evidence adduced to prove the amount of damages, to wit, that the gardens were in substantially the same condition in 1938 that they were nine years before in 1929. It would, manifestly, be absurd to contend that the trial judge could, by a visit in 1943, determine what the respective conditions of the gardens were five and fourteen years before. He was in no better position to determine these conditions by visiting the premises in 1943 than we are by inspecting the written record. His inspection of the premises cannot be held to have made the "tie up" between 1929 and 1938, or to have supplied, in the least degree, the missing link in the chain of proof. *Because of that missing link, the judgment appealed from is no more than a determination of what the damages would have been had the encroachments occurred in 1929.*

For the foregoing reasons, I have thought it my judicial duty to dissent from the majority opinion. I think the appellant state is legally entitled to a new trial.

JEFFERS and MALLERY, JJ., concur with ROBINSON, J.